**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JAKE L. KILLINGS, | ) | CASE NO. 1:12-cv-0479 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | NANCY A. VECCHIARELLI |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | MEMORANDUM OF OPINION |
| Defendant. | ) | AND ORDER |
| | ) | |

This case is before the magistrate judge by consent.  Plaintiff, Jake L. Killings ("Killings"), challenges the final decision of the Commissioner of Social Security ("Commissioner") denying Killings' application for a period of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i).  This court has jurisdiction pursuant to 42 U.S.C. § 405(g).  For the reasons given below, the court **REVERSES** the decision of the Commissioner and **REMANDS** this case to the ALJ for further proceedings consistent with this opinion.

## I. Procedural History

Killings filed an application for DIB on February 27, 2006.  The Commissioner denied Killings' application, and Killings did not appeal that decision.

Killings filed a second application for DIB on July 2, 2007, with a protected filing date of February 9, 2007, alleging disability as of April 1, 2004.[1]  Killings' application was denied initially and upon reconsideration.  On September 26, 2008, Administrative Law Judge Dennis J. LeBlanc ("ALJ") dismissed Killings' application, stating that Killings had filed an untimely request for an administrative hearing on June 30, 2008.  Killings appealed the ALJ's decision to the Appeals Council, which declined further review.

On April 14, 2009, Killings filed in this court a complaint against the Commissioner, alleging that (1) the Commissioner's notice to Killings regarding the filing of a request for reconsideration was erroneous and confusing; (2) Killings never received a notice that he had been denied reconsideration and, consequently, never filed a request for an administrative hearing; and (3) the ALJ's decision, finding that Killings had requested an administrative hearing on June 30, 2008 and dismissing Killings' application, was factually and legally erroneous.  Complaint, *Killings v. Commissioner*, Case No. 1:09-cv-0845 (N.D. Ohio 2009), Doc. No. 1.  On August 3, 2009, upon stipulation by the parties, the court remanded the case pursuant to the fourth sentence of § 205(g) of the Act, 42 U.S.C. § 405(g), to the ALJ for a hearing and a decision.  Doc. No. 14.

The ALJ held a hearing on September 10, 2010 at which Killings, represented by counsel, testified.  A vocational expert also testified.  The ALJ held a second hearing on May 6, 2011, at which Killings, represented by counsel, testified.  A medical expert, Dr. Malcolm Brahms ("ME"), and a vocational expert, Mark Anderson ("VE"), also testified.

_____

[1]  Killings subsequently filed a third application on January 8, 2010.

The ALJ issued a decision on June 8, 2011, in which he determined that Killings is not disabled.  Killings requested a review of the ALJ's decision by the Appeals Council.  When the Appeals Council declined further review on January 6, 2012, the ALJ's decision became the final decision of the Commissioner.

Killings filed an appeal to this court on February 28, 2012.  Killings alleges that the ALJ's decision is not supported by substantial evidence because (1) Killings meets the requirements of Listing 12.05(c), Mental Retardation; (2) the ALJ did not give good reasons for failing to give controlling weight to the opinion of Killings' treating physician; (3) the testimony of the VE was insufficient to carry the Commissioner's burden of proof at step five of the disability determination; (4) the ALJ's hypothetical question to the VE did not include all of Killings' limitations; and (5) the ALJ applied the wrong standard in refusing to reopen Killings' previous application.  The Commissioner denies that the ALJ erred.

## II.  Evidence

### A.    *Personal and Vocational Evidence*

Killings was born on July 23, 1965 and was 41 years old when he filed his second application.  He has a high school diploma, attending special education classes throughout high school but graduating timely.  He has held a number of unskilled jobs.  From 2001 through April 2004, Killings worked as a dishwasher for a Texas Roadhouse restaurant.  Killings also worked part time doing stocking from September 2004 through January 2005, part time as a packager for an unspecified period in 2006, part time doing assembly work in June and July of 2007, part time for a cleaning company from August 2007 through October 2008, full time as an assembler in February and March of

3

2009, and 35 hours a week as an inspector/hand packager for four or five months in 2009.  Tr. at 116-19, 310.

B.    *Medical Evidence*

On September 11, 2008, Killings visited Timothy Plank, D.O., for a check-up complaining of sharp chest pains and pain in the lower back.  Tr. at 540-41.  Physical examination revealed abnormalities of the feet and prostate, an eye disorder, and dermatitis from contact with poison ivy.  Dr. Plank also diagnosed hypertension, hyperlipidemia, obesity, and diabetes mellitus.  He did not record any physical manifestations associated with back pain.  Killings admitted not taking his insulin because he could not afford it.  Dr. Plank filled out forms that would allow Killings to receive Medicaid, "which at this point in time he appears to need desperately."  Tr. at 540.

Killings visited EMH Regional Healthcare System, Inc. ("EMH") on September 28, 2008 complaining of sharp pains in his chest.  Tr. at 585-86.  Killings did not report any problems with his spine, back, or extremities.

On October 10, 2008, December 16, 2008, March 16, 2009, September 21, 2009, and December 17, 2009, Killings stated to the office of Thuan v. Pham, D.P.M., that he had no difficulty performing or completing routine daily living activities.  Tr. at 492, 495, 497, 500, 625, 628.

On October 31, 2008, Killings reported to Dr. Plank complaining of lower-left side back ache, which Killings attributed to a muscle pull while he was trick-or-treating with his son.  Tr. at 534-35.  Killings denied radiation of pain into the legs,  numbness, tingling, or paresthesias.  Dr. Plank detected tenderness on the left side in the lumbar

4

paraspinal muscle area.  Straight leg raising was negative bilaterally; sensation was intact; and gait and stance were normal.  On November 11, 2008, Killings told Dr. Plank that he was now compliant with his medications, and his blood sugars and hemoglobin had improved.  Tr. at 527, 532.

Killings visited Paul S. Treuhaft, M.D. on December 16, 2008 complaining of aching, intermittent pain in his left knee.  Tr. at 493, 494-95.  Killings rated the pain as 9 on a ten-point scale.  Examination revealed a full range of motion in both knees with moderate joint line tenderness on the medial side of both knees.  There was more tenderness on the left side, accompanied by peripatellar tenderness and tenderness at the tibial tubercle.  X-rays of Killings' knees showed moderate medial narrowing of the right knee joint spaces and mild medial narrowing of the left knee spaces.  Tr. at 501-02.  There was no bone erosion, osteophyte formation, fracture, or dislocation.  There was also moderate superior and inferior hypertrophic bone formation of the patellas bilaterally.  There was no effusion, and the soft tissues appeared unremarkable.  Dr. Treuhaft diagnosed osteoarthritis of both knees.  Dr. Treuhaft believed that in the short term nothing more than Naproxen twice a day was needed to deal with Killings' knee problem, but he also asserted that Killings must lose weight to avoid greater long-term problems.  Dr. Treuhaft advised exercise and greater dietary care.

Killings again reported lower back pain to Dr. Plank on January 20, 2009.  Tr. at 530-31.  Killings denied radiation of pain into the legs, numbness, weakness, or tingling. Killings' wife told Dr. Plank on May 13, 2009 that his dietary habits had improved, and Dr. Plank noted that Killings' diabetes was under markedly better control.  Tr. at 525.

Killings suffered a severe headache on April 22, 2009 and reported to EMH.  Tr.

5

at 576-78.  The treating physician diagnosed Killings as probably having suffered a migraine headache.  Examination revealed 5/5 strength in all extremities.

On June 29, 2009, Killings reported to Dr. Plank that a week previously he had visited the emergency room suffering from muscle spasms two days after carrying a buffer at work.  Tr. at 680.  Killings complained of left-side pain in his back and leg, and Dr. Plank detected mild paralumbar spasms.  X-rays revealed mild degenerative changes of the lumbar spine.  Tr. at 682.

Visits to Dr. Plank in July, August, and November 2009 and January, April, and May 2010 included no complaints of back or knee pain, although Killings complained of difficulty walking on November 19, 2009.  Tr. at 655-79.

On August 5, 2009, Esberdado Villanueva, M.D. completed a physical Residual Functional Capacity Assessment of Killings' condition.  Tr. at 547-54.  According to Dr. Villaneuva, Killings was capable of lifting up to 20 pounds occasionally; up to 10 pounds frequently; standing or walking at least two hours in an eight-hour day; sitting about six hours in an eight-hour day; and pushing or pulling without limitation.  Dr. Villaneuva cited the results of x-rays taken on December 31, 2007, October 10, 2008, and December 16, 2008 of Killings' lumbar spine, feet, and knees as supporting his conclusions.  Dr. Villaneuva also opined that Killings should only occasionally kneel, crouch, or crawl; should never climb ladders, ropes, or scaffolds; and should avoid concentrated exposure to hazards.  On December 31, 2009, W. Jerry McCloud, M.D., reviewed Killings' record, noted that Killings had not alleged a worsening of his condition, and affirmed Dr. Villaneuva's assessment.

Killings visited Dr. Plank on August 12, 2010.  Tr. at 652-54.  Killings did not

6

report being in distress, although examination revealed severely limited range of motion and diffuse tenderness in the lumbosacral spine.  Killings attributed his largely sedentary lifestyle to back pain.

Dr. Plank completed a Medical Source Statement:  Physical Abilities and Limitations form assessing Killings' condition on August 12, 2010.  Tr. at 581-82.  Dr. Plank opined that Killings could stand for 15 minutes at a time; stand for a total of one hour in an eight-hour day; sit for 30 minutes at a time; sit for a total of four hours in an eight-hour day; lift and carry up to five pounds occasionally; lift and carry up to five pounds frequently; never stoop, balance, work around dangerous equipment, operate a motor vehicle, or tolerate cold; and only occasionally tolerate heat and tolerate dust, smoke, or fumes exposure.  He also opined that Killings suffered from extreme pain and that Killings' pain and limitations were the result of degenerative disc disease.  Dr. Plank added that Killings was taking medications that would adversely affect work performance and that Killings would be absent from work for four or more days per month due to exacerbations of pain and the need to take pain medications.  According to Dr. Plank, Killings would, during a typical workday, constantly experience symptoms severe enough to interfere with attention and concentration needed to perform even simple work tasks; needed a job that permits shifting at will from sitting, standing, or walking; would have to take hourly unscheduled breaks from working in an eight-hour day; and was incapable of performing even low-stress jobs.  Dr. Plank concluded by opining that Killins was unemployable due to severe, chronic lower back pain and neuropathy, illiteracy, poorly controlled diabetes, obesity, and osteoarthritis.

On October 14, 2010, Killings visited Dr. Plank complaining of a worsening

7

problem with his left knee.  Tr. at 649-51.  Killings also reported that his back pain was unchanged and "quite impairing."  Tr. at 649.  Examination revealed that the left knee was without effusion, but Dr. Plank noted pain and crepitation.  Examination of the lumbar spine again found severe limitation of motion but no focal bony points.  Dr. Plank reported that Killings' lower extremities were neurologically intact, except for mild hyposthesia to the toes, probably resulting from diabetes.  Tr. at 652.

From October 15, 2010 through March 2, 2011, Killings participated in physical therapy for his left knee.  Tr. at 686-718.  Early in his therapy, Killings complained of left knee pain ranging from five to eight on a 10-point scale.  He was diagnosed as having suffered a meniscal tear, which was repaired by surgery on January 20, 2011.  After surgery, he was diagnosed as having multiple loose bodies throughout the knee with chondromalacia of the patellofemoral groove.  Killings' physical therapist noted continued improvement throughout post-surgery therapy.  By February 16, 2011, Killings reported that he was free of pain and had no functional limitations.  Killings reported some pain in his quadriceps during his next session, but on March 2, 2011, Killings again reported no pain and no limitations.

On December 16, 2010, Thomas F. Zeck, Ph.D., a psychologist, examined Killings at the request of the ALJ.  Tr. at 635-43.  Killings reported that he did not drive, as his license was suspended after an accident in 1983.  Killings stated that he was seeking disability benefits due to his knee trouble since 1984 and back trouble since 1998.  Killings also told Dr. Zeck that he had been told he might need surgery for his back but that he rejected surgery as an option.  Killings was vague and uncertain regarding much of his medical history and his condition. He reported that he last worked

8

in 2003 at the Texas Roadhouse and was fired when his employer discovered that he had a felony conviction.  Killings did, however, mention a work attempt in 2008.  Although Killings reported that his back was sore during the interview, Dr. Zeck did not note any signs of discomfort.

Dr. Zeck found KIllings to be rambling and somewhat verbal but relevant and coherent.  Dr. Zeck also found Killings to be completely oriented, capable of counting backwards from 20, and capable of counting serial threes, although Killings made four mistakes in counting serial sevens.  He was able to give five digits forward and three digits backward.  Killings could not recall any of three items after five minutes; could not interpret any of the proverbs given him; and displayed borderline concentration, rote memory, immediate recall, reasoning ability, abstract thinking, logical thinking, and insight and judgment.  Killings reported feeding his children, doing dishes, cooking, and cleaning but denied doing laundry or shopping.  He enjoyed fishing and watching football and occasionally went to church and visited friends.

Dr. Zeck administered the Wechsler Adult Intelligence Scale-IV ("WAIS-IV") and reviewed the results of an IQ test that Killings had taken in 1998.  Killings achieved a verbal comprehension score of 66, a perceptual reasoning score of 79, a working memory score of 74, a processing speed score of 71, and a full scale score of 67.  Dr. Zeck summarized Killings' condition as follows:

> [T]he results of this evaluation indicate that Jake Killings is applying for social security primarily because he states that he has problems with his lower back and has arthritis in his knees.  Both of these things keep him from being gainfully employed because he cannot do much in the way of physical work.
>
> He has evidently refused surgery according to what he stated but no information was supplied regarding his injury or his diagnosis. . . .

His speech was relevant and coherent although he was rambling at times. He does appear to be somewhat depressed because he is not working, he is not contributing, and he has financial issues.

His judgment and reasoning abilities were within the borderline range.

Intellectually, it is felt that he is likely to fall within the borderline range even though he had a WAIS-IV of 67.

Tr. at 642. Dr. Zeck attributed Killings' full scale IQ score of 67, in part, to the fact that Killings "seemed tentative, hesitant, and lacking confidence in himself and his abilities." Tr. at 642. For this reason, Dr. Zeck described Killings' full scale score of 67 as a "minimal estimate of his intellectual functioning . . . ." Tr. at 642

In assessing Killings' work-related abilities, Dr. Zeck wrote in relevant part as follows:

1. This claimant's mental ability to relate to others including fellow workers and supervisors is felt to be adequate. He was friendly and basically cooperative during this evaluation and offered no resistance or hostility.

2. This claimant's mental ability to understand, remember, and follow instructions appears to be moderately impaired as he appears to fall within the borderline range of intelligence classification. He was borderline in his concentration, rote memory, and immediate recall. He was also borderline in his general comprehension abilities in terms of his responses to hypothetical judgment situations.

3. This claimant's mental ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks did not appear to be impaired. There did not appear to be any significant problems that would suggest that he does have an inability in this area.

4. This claimant's mental ability to withstand the stress and pressures of a day to day work activity may be mildly to moderately impaired by his physical condition. It may be difficult for him to put forth a 40 hour work week at this particular time. He might be given an opportunity to perform and see how well he does.

Tr. at 643.

10

C.    *Hearing Testimony*

At the first hearing on September 10, 2010, Killings testified that he had never had a driver's license because he failed the driver's test.  Tr. at 113-14.  He also testified that he had lost over 100 pounds in the past year, from 350 pounds to 245.  Tr. at 114.  He exercised by riding a bike, walking, and doing push-ups and sit-ups.  Tr. at 114.  He was able to walk five or six miles to the store and back with a 15 or 20 minute break, although the only thing he would carry on his way back would be his medications.  Tr. at 115.  Killings also told the court that at his last job in 2009 he worked for four or five months, 32 hours a week, from 8:00 a.m. to 3:30 p.m.  He noted that he would sit or stand as needed but he was on his feet "all day long" when he had to do inspections.  Tr. at 116.  The job included lifting 75 pound boxes from the floor to a table.  Tr. at 124-25.  He initially said that he lost his job because he couldn't read, but he also said that he and 15 others were fired because they were no longer needed.  Tr. at 117-18.  Killings also testified that he had applied for dishwasher jobs since losing his last jobs.  Tr. at 118-19.  According to Killings, he spends his time during a day walking, trying to find a job, fishing, and playing with his son.  Tr. at 120-21.  Killings also said that he cooked, mowed the lawn, shoveled snow, and had no problems getting along with people.

Killings testified that his biggest problems were his insulin, his back, and his pills.  Tr. at 122-23.  Killings said that his back started hurting in 2006 and has gotten worse since then.  Tr. at 123.  According to Killings, he cannot bend over to tie his shoes due to back pain, and he will have back pain if he tries to move something heavy, such as a television or a dresser.  Tr. at 123.  A heating pad helped his back pain.  Tr. at 123.

11

Killings said that doctors told him that he needed surgery, but he rejected this advice. Tr. at 123.

Killings also complained of arthritis in his knees, ankles, and arms.  Tr. at 126. Killings testified that he was born with arthritis and that it has gotten progressively worse over the years.  Tr. at 126.  Killings typically has problems with arthritis if he walks too much, resulting in his legs swelling.  Tr. at 127.  The arthritis medication helps with that, and he has no side effects from the medication.  Tr. at 127.

When asked about his physical problems when working as a dishwasher at the Texas Roadhouse in 2004, Killings testified that he was having problems with diabetes and arthritis, but that insulin and his arthritis medications were keeping these problems in check.  Tr. at 128.  He had no other physical or mental problems that kept him from doing his job as a dishwasher.  Tr. at 128.  The job had required him to lift loads of dishes weighing up to 80 pounds, and he was on his feet all day in that job.  Tr. at 129-30.

Finally Killings said that he was unable to make change and just had to trust whoever gave him change.  Tr. at 133.  He also testified that he thought he could probably do a dishwashing job if he found one, as long as he did not have to do any lifting of more than five pounds and as long as the floor was padded.  Tr. at 134-35.

The ALJ asked the VE to consider the jobs of dishwasher and inspector/hand packager.  He asked the VE if an individual restricted to simple, repetitive tasks could do those jobs, and the VE said that individual could.  The ALJ then asked if an individual who was limited to understanding, remembering, and carrying out one or two step instructions could perform those jobs, and the VE responded that they could, although

his opinion differed somewhat from the Dictionary of Occupational Titles ("DOT") with respect to the dishwasher job.  When asked, the VE also said that, at the unskilled level, those jobs could be performed by someone who could not read.

At the second hearing on May 6, 2011, Killings testified as to his current weight, which had risen to 310 pounds, and his address.  Tr. at 32. Upon questioning by his attorney, Killings testified that he could not now perform work as a dishwasher because his knees would now prevent necessary lifting and his feet would prevent him from being on his feet all day long.

The ME testified that Killings suffered from morbid obesity, diabetes, hypertension, abdominal pain, foot and knee problems, and migraine headaches.  Tr. 36-38.  The ME concluded, however, that Killings was not disabled.  Tr. at 38.  The ME opined that Killings could stand and walk for at least four hours in an eight-hour day and that he was, at least, capable of light work.  Tr. at 38-39.

The ALJ asked the VE to consider an individual 45 years old with limited education, able to lift and carry 20 pounds occasionally and 10 pounds frequently, who could stand and/or walk for up to four hours in an eight-hour day and sit for about six hours in an eight-hour day.  The described individual could also frequently climb ramps and stairs but could not climb ladders ropes and scaffolds, could frequently stoop and occasionally kneel, crouch, and crawl.  The individual must avoid exposure to such hazards as dangerous machinery or unprotected heights.  Finally, the individual could understand, remember, and carry out non-detailed, two or three step instructions and perform routine and repetitive tasks.  When asked if there were jobs in the national, regional, or local economy for such an individual, the VE said that there were, including

13

assembler, small products and assembler of printed products. With respect to the small products assembler, there were 109,000 such jobs nationally, 6,000 in the state, and 2,500 locally. With respect to the assembler of printed products, there were 175,000 nationally, 22,000 in the state, and 4,500 locally. Tr. at 43. When asked if these jobs could be performed by someone with a second grade reading level, the VE answered that they could be. Tr. at 44.

Killings' attorney examined the VE at length. First, he asked the VE whether the jobs of small products assembler and assembler of printed products could be performed with a sit-stand option. The VE replied that such jobs generally could be, but he did not know how many of the available jobs could be performed with such an option. Tr. at 45. The attorney also asked the VE if the DOT listed the number of jobs that were part-time versus the number that were full-time. The VE answered that it did not, but that the current population survey included data that could be interpolated to estimate that probably more than half of the jobs he cited were full-time. Tr. at 50. He also testified that it was very likely that more than 94% of the jobs in the general occupational category from which small products assembler and assembler of printed products is taken would be full time jobs, but he also testified that there were 1,587 jobs in that category. Tr. at 50-52.

### III. Standard for Disability

A claimant is entitled to receive benefits under the Act when he establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable

14

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. Second,  the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent his from doing his past relevant work, the claimant is not disabled.  For the fifth and final step, even if the claimant's impairment does prevent his from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

IV.  Summary of Commissioner's Decision

In determining that Killings was not disabled, the ALJ made the following relevant findings:

1.  The claimant has not engaged in substantial gainful activity since February 9,

15

2007, the application date.

2.  The claimant has the following severe impairments:
Osteoarthritis/degenerative joint disease, borderline intellectual functioning,
diabetes mellitus, obesity, and hypertension.

3.  The claimant does not have an impairment or combination of impairments that
met or medically equals one of the listed impairments in 20 CFR Part 404,
Subpart P, Appendix 1.

4.  After careful consideration of the entire record, the undersigned finds that the
claimant has the residual functional capacity to perform light work as defined in
20 CFR 416.967(b) except stand and/or walk 4 hours of an 8-hour workday; sit
for 6 hours of an 8-hour sit 6 [sic] freq climb ramps and stairs (but ladders ropes
and scaffolds [sic], frequently stoop, occasionally knee;, crouch, and crawl; he
would need to avoid hazards, such as dangerous machinery or unprotected
heights; he is able to understand, remember, and carryout [sic] non-detailed 2 to
3 step instructions and perform routine and repetitive tasks.

5.  The claimant is unable to perform any past relevant work.

6.  The claimant was born on July 23, 1965 and was 41 years old, which is
defined as a younger individual age 18-49, on the date the application was filed.

7.  The claimant is illiterate and is able to communicate in English.

8.  Transferability of job skills is not an issue in this case because the claimant's
past relevant work is unskilled.

9.  Considering the claimant's age, education, work experience, and residual
functional capacity, there are jobs that existed in significant numbers in the
national economy that the claimant could have performed.

11.  The claimant has not been under a disability, as defined in the Social
Security Act, since February 9, 2007, the date the application was filed.

Tr. at 15-22.

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence

in the record to support the administrative law judge's findings of fact and whether the

correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124,

16

125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

VI. Analysis

Killings alleges that the ALJ's decision is not supported by substantial evidence because (1) Killings meets the requirements of Listing 12.05(C), Mental Retardation; (2) the ALJ did not give good reasons for failing to give controlling weight to the opinion of Killings' treating physician; (3) the testimony of the VE was insufficient to carry the Commissioner's burden of proof at step five of the disability determination; (4) the ALJ's hypothetical question to the VE did not include all of Killings' limitations; and (5) the ALJ applied the wrong standard in refusing to reopen Killings' previous application. The Commissioner denies that the ALJ erred.

A.    *Whether Killings meets the requirements of Listing 12.05(C)*

Killing argues that facts in the record demonstrate that Killings meets the three requirements of Listing 12.05(C). The Commissioner denies this.

Listing 12.05(C) provides as follows:

**12.05 Mental retardation**: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or

17

supports onset of the impairment before age 22.  The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied. . . . .

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function . . . .

Listing 12.05(C).  Thus to satisfy the requirements of Listing 12.05(C), the claimant must demonstrate (1) significantly subaverage general intellectual functioning with deficits in adaptive functioning manifested before age 22; (2) a valid verbal, performance, or full scale IQ of 60 through 70; and (3) an additional work-related limitation of function that would constitute a severe impairment at step two of the disability determination.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A, § 12.00(A) ("For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a 'severe' impairment(s), as defined in §§ 404.1520(c) and 404.1520(c)"); 20 C.F.R. § 404.1520(c) (2011) (step two); and SSR 96-3p (defining a "severe" impairment).  The court shall examine in turn the ALJ's findings with regard to each requirement.

   1.   *Requirement 1:  Significantly subaverage general intellectual functioning with deficits in adaptive functioning manifested before age 22*

The ALJ did not deny that Killings had adaptive deficits before age 22.  The ALJ noted that Killings attended special education classes in school and that his grades consisted of mostly Cs, Ds, and Fs.  In his merit brief, Killings adds that he also reached only very low levels of reading ability.[2]

---

   [2]  Killings also makes note in his brief of a number of his current limitations, but these may or may not have manifested themselves before age 22.  Also, Killings testified, and now asserts in his brief, that he failed his driver's test.  But Killings also reported to Dr. Zeck that he obtained a driver's license and lost it after an accident.

18

2.    Requirement 2:   A valid verbal, performance, or full scale IQ of 60 through
      70

The ALJ found that Killings did not meet the second requirement of Listing

12.05(C),  a valid verbal, performance, or full scale IQ of 60 through 70, because

"[a]lthough the claimant was assigned IQ scores of 61 and 67, these were not

designated as valid scores."  Tr. at 17.  Killings makes three objections to this

reasoning.  First, the score of 67 was not designated as invalid.  That was the full scale

score achieved by Killings when Dr. Zeck administered the WAIS-IV to Killings at the

request of the ALJ.  Dr. Zeck commented, "His Full Scale IQ of 67 would place him

within the mild mental retardation range of intelligence classification, however, it is felt

that this should be considered a minimal estimate of his intellectual functioning because

he seemed to be tentative, hesitant, and lacking confidence in himself and in his

abilities."  Tr. at 642.  This is not a finding of invalidity, according to Killings.

Second, Killings argues that the relevant score in determining whether Killings

met Listing 12.05(C) is 66, not 67.  In determining whether a claimant meets the

requirements of Listing 12.05(c),  the Commissioner is required to use the lowest

available intelligence test score:

> The regulations state that "[i]n cases involving impaired intellectual functioning, a
> standardized intelligence test, e.g., the WAIS, should be administered and
> interpreted by a psychologist or psychiatrist qualified by training and experience
> to perform such an evaluation."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00 D.
> Claimant complied with the regulations.  The regulations require only that the
> lowest I.Q. score be used in conjunction with Listing 12.05 C.  This was done. (In
> fact, two of claimant's three scores from the WAIS-Revised exam fall within the
> range of scores signifying mental retardation under the regulations.)  The
> regulations specify that I.Q. scores ranging from "60 through 70" qualify an
> individual as mentally retarded.

Brown v. Secretary of Health and Human Servs., 948 F.2d 268, 270 (6th Cir. 1991).

19

Consequently, the proper score at issue in the determination of whether Killings is mentally retarded is his verbal comprehension score of 66.

When Dr. Zeck asserted that Killings' score was a "minimal estimate," he was referring to Killings' full-scale score of 67, not the verbal comprehension score of 66. Dr. Zeck's opinion regarding the validity of the verbal comprehension score is not in the record.

Third, Killings argues that given the ambiguity about whether Dr. Zeck's comments that the full-scale score of 67 is a "minimal estimate" of Killings' abilities meant that this score was invalid, the ALJ was obliged by the regulations to clarify whether this meant that some or all of Killings' IQ scores were invalid.  Killings argues as follows:

> At minimum, the phrase "minimal estimate" was not clear about the psychologist's estimate of the claimant's lowest IQ score.  The ALJ had a duty to contact Dr. Zeck and ask him for the missing information.  20 C.F.R. § 416.919p(b) ("If the [CE] report is inadequate or incomplete, we will contact the medical source who performed the consultative examination, give an explanation of our evidentiary needs, and ask that the medical source furnish the missing information or prepare a revised report"); *cf.* § 12.00(D)(6)(a) Subpt. P, App. 1 to 20 C.F.R. 404 ("the narrative report that accompanies the [standardized intelligence] test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation").  *Brown*, 948 F.2d at 270 ("We also note that the Secretary could have administered a second I.Q. test were he certain of the invalidity of Mr. Brown"s scores.  He did not.").  Since the lowest IQ score, Verbal Comprehension, was key, the ALJ had a duty to contact Dr. Zeck for an explanation of whether the Verbal Comprehension test score of 66 was valid and consistent with the claimant's developmental history and functional limitations in the verbal area.  It was the ALJ who ordered the psychological testing and CE, and the ALJ thus assumed the duties in the regulations.[3]

---

[3]  Killings also alleges that the ALJ believed that the psychologist's report had to "establish mental retardation" and include "a diagnosis of mental retardation," tr. at 69, before Listing 12.05(C) was satisfied.  Further, according to Killings, the ALJ threatened to

20

Plaintiff's Brief at 6.

Defendant's brief responds to Killings' arguments by asserting that Killings could not have been found disabled under Listing 12.05(C) because he did not exhibit the required deficits in adaptive functioning prior to age 22.  As the ALJ did not contest this point, the Commissioner's argument is irrelevant to whether the ALJ's opinion is supported by substantial evidence.

Defendant's brief also asserts that Dr. Zeck diagnosed Killings as being in the borderline range rather than retarded.  This, too, is irrelevant.  Listing 12.05(C) does not require a diagnosis of mental retardation.

The Commissioner, thus, responds to plaintiff's arguments by asserting arguments that the ALJ did not make and by supporting a position implied by the ALJ that is incorrect.  The Commissioner does not directly respond to plaintiff's position with respect to the uncertainty regarding Dr. Zeck's comment regarding the meaning of "minimal estimate" or regarding use of the verbal comprehension score of 66 as the proper measure of whether Killings meets the requirements of Listing 12.05(c).

At the very least, the ALJ should have inquired as to whether Dr. Zeck's comment that the full scale score was a "minimal estimate" meant that all of Killings' WAIS-IV scores were invalid.  If Dr. Zeck said that, indeed, all the scores were invalid, the ALJ should have had Killings re-tested, as recommended by *Brown*.  Given the ALJ's failure to clarify this portion of the record, his finding that Killings does not meet Listing 12.05(C) is not supported by substantial evidence.

---

exclude the CE report from evidence if counsel objected to the way the ALJ was interpreting it.  These allegations are supported by the record.  *See* tr. at 69.

B.    *Whether the ALJ failed to give good reasons for not giving controlling weight to the opinions of Killings' treating physician*

Killings contends that the ALJ erred because he failed to give good reasons for not giving the opinion of Dr. Plank, Killings' treating physician, controlling weight.  The Commissioner denies that the ALJ erred.

The medical opinion of treating physicians should be given greater weight than those of physicians hired by the Commissioner.  *Lashley v. Secretary of Health and Human Servs.,* 708 F.2d 1048 (6th Cir. 1983).  Medical opinions are statements about the nature and severity of a patient's impairments, including symptoms, diagnosis, prognosis, what a patient can still do despite impairments, and a patient's physical or mental restrictions.  20 C.F.R. § 404.1527(a)(2).  This is true, however, only when the treating physician's opinion is based on sufficient objective medical data and is not contradicted by other evidence in the record.  20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); *Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1370 & n.7 (6th Cir. 1991); *Sizemore v. Secretary of Health and Human Services*, 865 F.2d 709, 711-12 (6th Cir. 1988).  Where there is insufficient objective data supporting the opinion and there is no explanation of a nexus between the conclusion of disability and physical findings, the factfinder may choose to disregard the treating physician's opinion.  *Landsaw v. Secretary of Health and Human Servs.,* 803 F.2d 211, 212 (6th Cir. 1986).  The factfinder must, however, articulate a reason for not according the opinions of a treating physician controlling weight.  *Shelman v. Heckler*, 821 F.2d 316 (6th Cir. 1987); *see also* 20 C.F.R. § 404.1527(d)(2) (2011) (requiring "good reasons" for the weight accorded to a treating source's opinion).

22

In his opinion, the ALJ noted that Dr. Plank had opined that Killings was unemployable and noted Dr. Plank's estimate of Killings' functional limitations. The ALJ then wrote as follows:

> I assign less weight to Dr. Plank's opinion. Even though he is a treating physician, his opinion conflicts with other substantial evidence in the record, including several other opinions and the claimant's acknowledged level of functioning. In particular, the claimant testified at the first hearing in this matter that he believed he would be capable of returning to his prior occupation as a dishwasher. The claimant's own acknowledged capacity weighs heavily in favor of accepting the non-treating physicians over Dr. Plank in this case.

Tr. at 20.

Killings contends that the reasons given by the ALJ are both insufficient and inaccurate. Indeed, the ALJ's reasons are insufficient in two respects. First, by itself, the statement that Dr. Plank's opinion "conflicts with other substantial evidence in the record" does not meet the standard of SSR-96-2p, which requires that the ALJ's decision "contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinions and the reasons given for that weight." Second, the fact that Dr. Plank's opinion conflicts with the opinions of non-treating physicians is not a sufficient reason, by itself, to give Dr. Plank's opinion less than controlling weight.

The validity of the ALJ's decision to give less weight to Dr. Plank's opinion, therefore, rests on the ALJ's assertion that Killings testified at his first hearing that he believed he would be capable of returning to his prior occupation as a dishwasher. That assertion, however, is not entirely accurate. Although Killings testified without elaboration that he could do the job of dishwasher, tr. at 119, he later clarified what he

23

meant by that:

Q -- do you think you could work as a dishwasher?

A Yeah, right now probably –

Q How –

A – if they doing any hiring.

Q All right.

A 'Cause I went out – up to Texas Roadhouse over there on Levitt Road and they ain't doing no hiring right now.

Q So, how would you be able – you think you could handle all the picking things up that you were telling your attorney?

A Oh, I wouldn't pick it up. I would just let somebody else go do that.

Q How about –

A That's how I put it on my application.  I tell 'em that I can't lift no weight.  I can't lift over 5 pounds.

Q You're writing that on your applications?

A Yeah. I get my wife to write it.

Q All right.  And she goes with you to do the applications –

A Yes.

Q -- for you?

A Yes, she goes with me.

Q And how about being on your feet?  Weren't you on your feet all day when you were doing the dishwasher job?

A Yes.

Q How would you be able to do that?

A 'Cause they got padding on the floor like a padding you can stand on -- it's like

24

a cushion -- and that -- I stand on that all day long.  Till you get off of it, that's when your feet start swelling up.

Tr. at 134-35.  In other words, Killings testified he could perform the job of dishwasher if he lifted no more than five pounds and stood on a padded floor.  Thus, the ALJ's assertion that Killings testified that he would be capable of returning to his prior occupation as a dishwasher is incorrect.

Once again, the Commissioner defends the ALJ's decision by raising points that the ALJ himself never made, such as inconsistencies between Dr. Plank's notes and his opinions and Dr. Plank's alleged failure to recognize Killings' improvements due to treatments.  These issues are not relevant to determining whether the ALJ's opinion is supported by substantial evidence.

As described above, the ALJ's reasons for not giving the opinions of Dr. Plank controlling weight were insufficient.  It cannot be said, therefore, that this portion of the ALJ's opinion is supported by substantial evidence.

C.      *Whether the ALJ's hypothetical question to the VE included all of Killings' limitations*

Killings observes that although the ALJ found that Killings "would need to avoid hazards" when working, the ALJ's hypothetical supposed an individual who had to avoid *concentrated* hazards.  Thus, Killings concludes, the ALJ's hypothetical did not properly include all of Killings' limitations.  The Commissioner does not reply to this argument.

The court cannot determine whether the use of "avoid concentrated hazards" rather than "avoid hazards" in the hypothetical question made any significant difference in the VE's estimate of the number of jobs in the national economy that Killings could perform.  As this case must by returned to the ALJ, the ALJ must re-ask the hypothetical

question to the VE, rephrasing the question to eliminate the restriction to an individual

who must avoid only "concentrated" hazards.

D.      *Whether  the ALJ applied the wrong standard in refusing to reopen Killings'*
        *previous application*

Killings argues that the ALJ justified his decision not to reopen Killings' prior

application by stating, "there is no new and material evidence that would justify

reopening these applications," Tr. 13.  However, the prior application was denied less

than one year before the protected filing date of the current application, so the prior

application can be reopened "for any reason." Good cause, such as new material

evidence, is not required under this rule. 20 C.F.R. § 416.1488(a).  The Commissioner

does not reply to this argument.

"A decision not to reopen a prior, final benefits decision, . . . is discretionary and

not a final decision; therefore, it is not subject to judicial review."  *Evans v. Chater*, 110

F.3d 1480, 1482 (9th Cir. 1997) (citing *Califano v. Sanders*, 430 U.S. 99, 107-09 (1977).

There is an exception to this rule only when "the Secretary's denial of a petition to

reopen is challenged on constitutional grounds."  *Sanders*, 430 U.S. at 109.  As Killings

does not cite any constitutional grounds for challenging the ALJ's refusal to reopen the

prior determination, that decision is not subject to judicial review by this court.

E.      *Whether the testimony of the VE was sufficient to carry the Commissioner's*
        *burden of proof at step five of the disability determination*

As this matter must be remanded to the ALJ, the court need not address whether

the testimony of the VE was sufficient to carry the Commissioner's burden of proof at

step five of the disability determination.

26

VII.  Decision

For the reasons given above, the court **REVERSES** the decision of the Commissioner and **REMANDS** this case to the ALJ for the following:

1. The ALJ must clarify whether Dr. Zeck's comment that the full scale score was a "minimal estimate" meant that all of Killings' WAIS-IV scores were invalid.  If that is the case, the ALJ must obtain a valid intelligence test score. If not, the ALJ must use the verbal comprehension score of 66 in determining whether Killings meets the Listing at 12.05(c).  In either case, the ALJ must reconsider whether Killings meets that Listing.

2. The ALJ must reconsider whether the opinions of Dr. Plank should be given controlling weight and, if not, give good reasons for not doing so.

3. The ALJ must rephrase the hypothetical question to the VE to eliminate the restriction to a supposed individual who must avoid only "concentrated" hazards.

**IT IS SO ORDERED.**


Date:  November 6, 2012                    s/ *Nancy A. Vecchiarelli*
                                           Nancy A. Vecchiarelli
                                           U.S. Magistrate Judge